138

JOHN CRIBBS

*v.*

STATE OF TENNESSEE.

(*Jackson*, April Term, 1959.)

Opinion filed May 1, 1959.

L. L. HARRELL, Trenton, L. K. MATHERNE, Brownsville, LYMAN INGRAM, Dyersburg, for plaintiff in error.

THOMAS E. FOX, Assistant Attorney General, for the State.

MR. JUSTICE TOMLINSON, delivered the opinion of the Court.

This is an appeal by Cribbs from a conviction of the offense created by Code Section 59-1001, commonly known as the "hit and run" statute. His punishment was fixed at a fine of $2,500 and confinement in the workhouse for eleven months and twenty-nine days. He denies that he was the driver of the offending car, or was in Haywood County that day, and, along with other evidence, offers evidence which he says establishes a complete and irrefutable alibi. The person struck by the offending automobile was the prosecutor, Arthur J. Walton. He was so seriously injured as to necessitate the amputation of his leg and a considerable stay in the hospital.

■ Although it is true that the Trial Court erred in not requiring Walton to testify on cross-examination as to whether he had a civil suit pending against Cribbs by reason of this occurrence, and thereby was the more interested in the outcome of this case, and, although it is true that the district attorney made an apparently incompetent statement in his jury argument, nevertheless, neither of these errors was prejudicial. At the outset, therefore, is reached the only other question made, to-wit, whether the evidence preponderates against the verdict.

To avoid repetition, it is well at this point to state that the offending automobile was a black five passenger 1956 Chevrolet with an aerial on its left rear fender. Only the driver was in it at the time of the accident. Cribbs, at that time a member of the Tennessee Bureau of Investigation, was in possession of, and operated, a Chevrolet

car of that description.  The weight of the evidence is that the Chevrolet he operated was perhaps the only such Chevrolet in Dyer County, where Cribbs lived.  The point of the hit and run accident was nineteen miles from Dyersburg.  Cribbs lived six miles beyond Dyersburg, or twenty-five miles from the scene of the accident.  There were no eye witnesses other than Walton and the driver of the Chevrolet.

The accident occurred somewhere between 6:00 and 6:30 P.M. on Wednesday evening, September 4, 1957, about one half mile north of a place known as Forked Deer.  The lights of the Chevrolet were turned on as it approached the truck, according to the prosecutor, and it was "just about sun down", according to State's witness, Jordan; or as State's witness, Daniels, puts it "it was between 6:15 and 6:30, it was right at night, it was still light"; or as fixed by State's witness, Oscar Jefferson, it was around "just about dark".

At the point of the accident, Walton alighted from his southbound truck, after stopping it on his right hand side with the right wheels entirely off the traveled portion of the highway.  As he started to walk along the left hand side of the his truck towards its rear, he saw approaching from the south the Chevrolet in question. This Chevrolet, when close to Walton, was suddenly guided from its own right side to its left side of the highway, and continued at what Walton describes as a slow speed to the truck, where it mashed Walton between the two vehicles and dragged his upstanding body to the rear of the truck where he fell, while the Chevrolet continued on its way without stopping.

Henry Jordan heard the crash. Very shortly there-after this Chevrolet driving north towards Gates and Dyersburg passed him at a rapid speed and "a little bit wavy". He arrived at the scene immediately after Robert Clark, who was the first man to reach the injured Walton. He was passed by this Chevrolet a short distance north of the accident point, and was driving in such a manner as to almost run him down. Neither of these men saw the face of the driver well enough to identify him.

A Chevrolet of this description was seen by State witnesses, Bub Haynes, Walter Goodman, Roy Hibbitt and Russell Groves on the day of the accident at times ranging, according to them, between 4:00 and 5:30 P.M. They necessarily refer to times previous to the accident. One of them says that it was being driven so fast that he had to step back to keep from being run over; another, that this reckless speed and manner of driving was over a quite rough road full of holes, and with which road the driver of the Chevrolet seemed not to be familiar.

Walton says that when the car approached he knew the man's face, but did not know his name. His first recollection of Cribbs is that he saw him some years before in a beer joint and was told by some one there that his name was John Cribbs, and some years before the accident, when Cribbs was a deputy sheriff, he electioneered with Walton in Dyersburg. He said he had seen him "plenty of times", and that when the Chevrolet first approached him at the scene of the accident "I thought he was an old friend"; just couldn't recall his name. When a patrolman interviewed him at the hospital a few days later, and discussed the identity of the offender,

Walton did not suggest, according to the patrolman, that the offender was known by Walton to be a former deputy or sheriff of Dyer County. Nor did Walton mention any other time or place where he had ever seen the face of the driver of the Chevrolet.

The patrolman just mentioned had a joint photograph of Cribbs and another TBI agent. He presented that picture to Walton at the hospital. Walton's testimony is that it was dark there, but that he told the patrolman that one of he men "looks sort of like him, but would not say". This patrolman, Rogers, testifies that on this occasion Walton told him that "I believe I could identify him if I ever come face to face with him again," but that "none of these people in there (the photograph) was the one that was driving the car", but did complain about not having his glasses. It was not until two weeks before the trial more than a year later that Walton first saw Cribbs after the accident. He positively identifies him at the trial as being the driver of the Chevrolet which ran him down.

Haynes, who saw the car speeding by him between 4:30 and 5:00 got "a minute's view" of the driver of the Chevrolet car, and "it was a second and he was gone". He says that this driver "favored" the defendant. Hibbitt, who was with Mr. Groves, and saw a Chevrolet of this description around 4:00 P.M., testifies that the defendant "looks like the man who stopped and talked to Groves". Groves, who saw such a Chevrolet about 5:30, said that the defendant Cribbs "favors him a lot if he had a little more flesh on his face". (Cribbs had had more flesh on his face at the time of the trial than he did at the time of the hit and run occurrence a year before.)

"Looks near enough like him to be his twin brother, but I don't know whether to be positive on the identification or not". The defendant had been bald for a number of years. Groves said that he surely must have had a hat on because "I thought the man had hair, and it was an odd color * * * must have been a shadow coming through the windshield". He observed that the man who was driving this car had a pretty full face and weighed between 200 and 225 pounds. Cribbs weighed 180 pounds at time of trial; a little less at the time of the accident. Goodman, who saw this Chevrolet around 5:30, said he could not identify the man.

A State's witness named Daniels said that the driver of this Chevrolet stopped at the store where he happened to be and asked "Will this road carry me out to Gates?" Cribbs and his wife had lived at Gates a number of years before and was familar with the roads. Witness says he got a good look at him. Witness was sitting on a store porch, and the time was, according to him, "right at night", "but it was still light". Within a very few minutes Clark came running to the store and informed them about the accident. On Wednesday or Thursday of the following week between 10:00 and 11:00 P.M. a patrolman brought three men, one of whom was the defendant, another, his son, and asked him to pick out that one of the three who was driving the Chevrolet at the time of the accident. He picked the defendant with the remark, so he says, "If that is not the man, get his twin brother". Upon being so picked out he says the defendant remarked "Have we anywhere else to go, if I run over anybody I want to know it". This witness is an uncle of a man whom the defendant, as a member of the TBI, aided in

prosecuting for house breaking in four or five counties, and is a half uncle of Walton.

As to the hat which was being worn by the driver of the Chevrolet, the State's witnesses testify as follows:— Walton,—"a little narrow brimmed hat"; Daniels,—"a little narrow brimmed hat, I think it was dark or one of those shaded straw hats". The State's witnesses who saw the driver of a like Chevrolet between 4:00 and 5:30 P.M., as heretofore related, are not at odds with the testimony of Walton and Daniels as to the description of the hat worn by the driver of the offending Chevrolet. There is no evidence to the contrary.

Therefore, in consideration of this case, it must be accepted as a fact that the driver of the Chevrolet which struck Mr. Walton wore "a little narrow brimmed hat"; "dark or one of those shaded straw hats".

As to the kind of shirt worn by the driver of the offending Chevrolet, the testimony of the State's witnesses at the scene of the accident, and about that time, is as follows:—Mr. Walton,—A flowered shirt which he recollects "mighty well"; Daniels, — "an open necked sport shirt, short sleeves, I would call it a loud shirt, a summer sport shirt". In rebuttal this witness testified that on the night the patrolman brought Cribbs there with two other men, as heretofore related, he (Cribbs), says the witness, "before this Court and my God he was dressed in a sport shirt similar to those those jurors have on. If they wasn't short sleeves they was rolled up, his arm was naked to his elbows". It does not appear what kind those jurors had on. In rebuttal the State's witness, Mrs. Tyler, who lives at Alamo, testified that she saw Cribbs at her home last fall wearing a sport shirt

with short sleeves. Her husband and Cribbs seem to be good friends. Her daughter testifies as to the sport shirt, but does not recall the type of sleeves.

As to the State's witnesses who saw a Chevrolet of identical description between 4:00 and 5:30 P.M. on the day of the accident, the testimony as to the shirt worn by the driver is as follows:—Walter Goodman,—"looked like a dark suit"; Roy Hibbitt,—a short sleeved shirt "just white"; Russell Groves,—"it wasn't all one color. Either short sleeved or rolled up"; "laid off in squares of different colors".

Following all the above related testimony of the State, defendant, in his own behalf, testified, among other matters, in detail as to his whereabouts on the day of this accident, Wednesday, September 4, 1957. Hereinafter that testimony, in so far as material, will be related.

Cribbs testified that for many years he had worn only a Texas style broad brimmed brown, white or gray hat. His wife testified to like effect, as did his mother. His wife said that she had never known him to wear a narrow brimmed hat and, to quote her, "I don't think that anybody else can ever say they have seen him wear one". No one, although he had lived in Dyer County twenty-five years, and had been very active there in politics, testified that they had ever seen him wearing a hat of the description worn by the driver of the Chevrolet that struck Mr. Walton. A photograph of Cribbs taken in 1953, and another several years later, each showed him wearing the broad brimmed Texas style hat.

The evidence of the defendant, his wife, and his mother is that he never owned a short sleeved sport shirt, but did own white, gray and tan sport shirts with long sleeves.

So here, evidence of the State contradicts that of defendant. And the State witnesses, to some extent, contradict each other as to the shirt.

A. L. Wooley, a policeman of many years service at Dyersburg, testified that on the evening of this accident, he was on duty, operating the police radio; that at 7:20 P.M., as shown by the log which he had to keep, there came over the radio to him a message that this hit and run accident had occurred "about 6:30"; that he was then given a description of the car involved without the name of the driver being mentioned, and told that its left front head-light would probably be broken. The only car he could think of in Dyer County that fitted that description was the car operated by Cribbs. He called Cribbs at his home, six or eight miles away, told him about it, and Cribbs came to the station arriving around 8:00 o'clock, and parked his Chevrolet in front of the station. Mr. Wooley says that he looked at the car; that there was a rusty dent in the right front door, but no damage to the left hand side of the car. It was, according to prosecutor Walton, the left hand side of the Chevrolet which mashed Walton against his own truck, and dragged him to the end of its rear.

Wooley is corroborated by witness, George Jones, who says that he was at the home of Cribbs, pursuant to a plan to go coon hunting that night, when the call from Policeman Wooley came in. Warner Agee, a deputy sheriff of Dyersburg, says he heard the radio call, went to the police station and talked with Chief Wooley about the Cribbs car being the only one they knew of that description in Dyer County, and was there when Deputy Wooley called Cribbs.

James P. Lanier, the incumbent County Court Clerk of Dyer County for twenty years, testifies that around 6:00 P.M. on the evening of this accident he was called by the sheriff of Dyer County and told that "an ex-sheriff of Dyer County had been involved in the accident, had been suspicioned" and insinuated that it was Cribbs and informed him that Cribbs was being questioned at the police station; that a little bit later a member of the highway patrol called and told him the same thing. Here, it is material to notice that Cribbs was being accused of being the hit and run driver before any one who purported to see the face of the driver had intimated that it was the face of Cribbs. Of course, therefore, the charge that night that Cribbs was the guilty man was a charge based solely on the fact that he drove a car of the same description as the one which an hour and a half to two hours before had run Walton down.

Mr. Lanier says that he had recommended Cribbs for appointment as an agent of the TBI and, therefore, felt some concern; "had a personal interest to convince himself as to whether or not I thought he was guilty", and thought that he would be called from Nashville and asked about it. Therefore, says Mr. Lanier, when, on the next morning he saw the Chevrolet of Cribbs in question parked on one of the streets of Dyersburg, and no one in it, he "examined it all around" very closely and found that the left hand side of this car was "smooth", there was nothing about the car to indicate that it "had been in an accident within a twenty-four hour period".

James P. Roberts testified that he and his wife, together with Mr. and Mrs. Dement, all residents of Dyersburg, were invited to a dinner at either 6:30 or 7:00 P.M.

at the home of a friend at Maury City, which is twenty-one miles southeast of Dyersburg. They left Dyersburg five or ten minutes later than planned. When they were within from three to five miles of Maury City they met a car which they thought to be the car of John Cribbs, with which car they were familiar. Roberts was the Chevrolet dealer at Dyersburg. It ran them off the road. As it passed the witness saw "that the left door was bent on the car". On the next morning he saw Cribbs between 8:30 and 9:00 and said something to him about running them off the road. The witness was not allowed to state the reply of Cribbs, other than to say that Cribbs invited him to come and look at Cribbs' car. He looked at it, particularly the left door; that it wasn't bent and had on it the dirt or film usually settling on a car in driving it for a period of time. Based thereon, he testified that "I would say it was not the same car I saw that night".

Dement, the companion of Roberts on that occasion, likewise so testified. The description he gave of the Chevrolet which ran him off the road is that "the left door was bent in", "creased in", "caved in", and that he and Roberts commented on that fact after this speeding car had passed them.

Dement says that on the next morning he saw Cribbs, stopped him, looked at the door, and when Cribbs asked him what he wanted he said he had intended to whip him if he had found "your door had been bent". Both Roberts and Dement testify that on this night they thought it was Cribbs solely because they thought it was Cribbs' car. The dinner engagement was on Wednesday night. That was the week night of this hit and run occurrence. It was two or three days after the night of this dinner

engagement that Roberts says he learned of this hit and run occurrence.

As hereinbefore noted, Cribbs gives a detailed statement of his whereabouts during all of that day and evening, with names and places specified. Considering, however, the fact that an alibi, even though it be the truth, is no alibi at all if it leaves it possible for a defendant to have, nevertheless, committed the crime. So, the Court will concern itself only with that part of such proof as throws light upon his whereabouts at the time of the hit and run occurrence.

There has hereinbefore been related the testimony of Wooley, the radio policeman, that after he received the radio message of the accident at 7:20 P.M. he called Cribbs at the latter's home, talked to him and Cribbs was at his office thereafter by 8:00 P.M. Certainly no one would doubt the truth of that testimony. The point of the accident, it is well to keep in mind, was from twenty-five to twenty-seven miles from Cribbs' home, and the time of the accident was between 6:00 and 6:30 P.M. This testimony, within itself, therefore, does not rule out the possibility of Cribbs being at the scene of the accident between 6:00 and 6:30 P.M.

There is in the record a certified copy of a judgment of the Circuit Court of Dyer County in the case of *Shelly, Administratrix, etc. vs. Wheeler,* a minor, et al. That judgment, as shown upon its face, was entered on September 4, 1957, the date of the crime under investigation here. It recites that on that day, the jury returned its verdict, etc. The judgment, of course, followed. The defendant testifies that he came into the courtroom on that date just after the jury had returned, and an-

nounced its verdict. He names as being present at the time E. T. Palmer, the mayor of Dyersburg, who was one of the attorneys in the case, J. W. Moody, Bob Smith, and Lyman Ingram, one of the attorneys in the case at bar. He says he talked to these men, and that it was "a little after five o'clock".

Palmer testifies to a conversation with Cribbs in the courtroom and fixes the hour at "about the time—maybe after the jury came back" which according to his best judgment was "a little bit after five o'clock". He recalls Cribbs' presence, because he talked with him at the time about getting back the driver's license for one of the boys whom he, Palmer, was representing in that case.

Moody's testimony is that he was in the courtroom at the time to get his boy, who was a witness in the case, and that he talked to Cribbs there for five or ten minutes about getting his son's driver license back. He was certain that the hour was after five o'clock because "I was trying to get to Carter Clicks before they closed, and they close at five, and I just did get out there and it had to be after five".

Childress, one of the jurors in that case, was a reporter for the Commercial Appeal. On the day after the verdict was rendered another reporter, he says, from the Commercial Appeal called him and asked him "if I knew that a Dyer County man, Mr. Cribbs, who was an agent for the TBI was under suspicion in connection with the case * * *"; thereupon, he recalled that he had seen Cribbs in the courtroom the preceding day but does not know whether it was before or after the verdict was returned. The testimony of Mr. Ingram is that he talked to Cribbs in the courtroom about the time the jury came in. He was

unable to fix the time other than that he knew it to be after four o'clock because he was due to report at four at the practice of a Pee Wee football team of which he was coach, and did miss that practice.

Mr. Cribbs says that he went from the courtroom to the Rexall Drug Store in Dyersburg where he conversed with County Judge Elmer Gardner and Robert Olive; that Olive lives in the same community in which he lives and wanted to ride home with him.

Judge Gardner testifies that he heard about this crime the day after it happened; that on the evening previous at "some time after five o'clock" he talked to Cribbs in front of the Rexall Drug Store. He is able to fix the time as being after five because "I usually leave my office around five o'clock"; that Robert Olive was there also.

Mr. Olive testifies that his daughter was employed at this drug store, and that he had carried his automobile there for her to come home in, and seeing Cribbs asked him to let him, Olive, ride home with Cribbs, and that he did so, his home being about two or three miles from that of Cribbs. He fixes the time that he saw Cribbs at this drug store as between 5:20 and 5:30 P.M. and he does it this way:—He leaves work at 4:30 and then travels to Dyersburg ten or eleven miles distance in a state truck, and then gets his own car, and took it that day to his daughter at the drug store for her use in coming home after working hours.

According to Cribbs, when he got home some six or eight miles distance from the Rexall Drug Store a Mr. George Jones, with whom he was going coon hunting that night, was there, and shortly after his arrival his wife

told him of a communication from the TBI office in Nashville directing him to get in his official reports each Wednesday and Friday. This was Wednesday; that, thereupon, he went with Mrs. Cribbs to his office in Dyersburg driving this Chevrolet, and on the way met Sergeant Hammett of the highway patrol. He was in his office for a few minutes; then went to the city limits for an ice cream cone that his wife wanted, turned back and at an intersection where he was stopped by a red light, saw Mr. Roberson, another highway patrolman; from there he went on home for the second time, arriving "about black dark". Within about thirty to forty minutes thereafter, and while his wife was preparing some food before he and Jones started coon hunting, he received a call from policeman Wooley about this hit and run accident in Haywood County, and was informed that the car there involved was one which fits the description of defendant's car. He thereupon went directly to the police station in Dyersburg.

George Jones testified that he was at the Cribbs' home when Cribbs arrived "a pretty good little bit before dark"; that while they were conversing in the yard his wife told him about sending in the reports; that then Cribbs left with his wife and was gone for thirty to thirty-five minutes. He waited because their plan was to go coon hunting that night. That while Mrs. Cribbs was preparing some supper the "police called out there and said for him to come to town, somebody got run over". It was "about dark" when he left with Mrs. Cribbs the first time.

W. E. Hammett, a member of the Tennessee Highway Patrol, testified that about 10 o'clock on the night of the

crime, while he was at the Dyersburg Fair, he was called and informed about the hit and run crime; that earlier in the evening "twenty or thirty minutes before sun down. I don't know the sun real low" Cribbs, together with his wife, came to the patrol station where Cribbs had a room for his office, and that he said only a few words to Cribbs.

Roberson, another Highway Patrolman above mentioned, testified that on the evening of the crime he received a radio message about it,—"I believe the word was coming back of his car. And I believe the Assistant Chief Wooley was talking to Mr. Cribbs at the time he received the radio message and went into the police station. He then recalled that between forty-five minutes and one and one-half hours before he received this radio message he had seen Mr. and Mrs. Cribbs driving what would be the natural route to follow in going from the Dairy Queen, where the ice cream cone was obtained, to Cribbs' home, and added that it would be the shortest route. He said that when he saw them it was "the time of evening that you would have your lights on or would not have, it was just up to the individual".

Having thus stated in much more than usual detail the evidence in this case in considering the insistence that the evidence preponderates against the verdict and in favor of defendant's innocence, it is now the duty of the Court only "to state its conclusion, upon both the facts and the law". *Cooper v. State*, 123 Tenn. 37, 61, 138 S.W. 826, 831. With the utmost respect to the jury and the conscientious and very able judge who tried this case, that conclusion is that the evidence preponderates rather heavily, this Court thinks, against the jury's verdict without regard to whether any weight, solely because of the

jury's verdict, is given to what appears to this Court to be an alibi which conclusively establishes it to be a fact that it was physically impossible for Cribbs to have been at the scene of this crime at the time it occurred, or during a period at least more than an hour before or after. And in this connection read the old case of *Wynne v. State*, 45 Tenn. 319, dealing with identification and alibi.

■ The guilt of this defendant, based on this record, must necessarily depend upon the character and quality of the proof of his identity. This Court is of the opinion that the evidence preponderates, for the following reasons, against the accuracy of that evidence:

[1]. The opportunity of Walton and Daniels, the two witnesses who purport to identify him at the time and scene of the accident, were so unfavorable for the reasons shown in their proof as to give little weight to the accuracy thereof. It was almost night, and Walton was being subjected at the time of the observation with a most horrible physical experience. Daniels was sitting on the porch of a store viewing in the thickening twilight the driver of the car which he did not know at that moment had run down his nephew.

Daniels identified Cribbs a week later as the one he had seen driving the car. But at that time the rumor was abroad that Cribbs was that man. We cannot leave out of consideration the unconscious influence of suggestion in such a situation.

Their identification during the trial is of little value. As observed by Wigmore on Evidence, Volume 4, Section 1130, page 208:—"Ordinarily, when a witness is asked to

identify the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the court-room, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity.''

[2]. It is an established fact that the driver of the offending Chevrolet wore a ''little narrow brimmed hat''. The weight of the testimony is that Cribbs never wore such a hat, and there is no testimony to the contrary.

[3]. The driver of the offending Chevrolet was unfamiliar with the territory, as witnessed by his inquiry as to whether the road he was upon led to Gates. It is a well established fact in this record that Cribbs had lived at Gates and was entirely familiar with this territory.

[4]. The condition of the left side of Cribbs' Chevrolet as that condition was observed by disinterested witnesses within an hour and a half or two hours after the accident, and again on the next morning by other witnesses, strongly refutes the insistence that this was the Chevrolet which had run Mr. Walton down.

It is not inappropriate to observe, in closing this opinion, that Wigmore in Volume 3 of his work on Evidence, Section 786a observes that ''some of the most tragic miscarriages of justice have been due to testimonial errors in this field''. Among the reasons to which he attributes such miscarriages, one is ''suggestion''.

Reversed and remanded.